UNITED STATES of America,
Plaintiff–Appellee,

v.

Willie EASTER, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Ronnie O. LEA, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Paul JEMERIGBE, Defendant–Appellant.

Nos. 94–10344, 94–10345 and 94–10603.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 13, 1995.

Decided Sept. 5, 1995.

Kent V. Anderson, West Sacramento, CA, for defendant-appellant Easter.

Alister McAlister, Wilton, CA, for defendant-appellant Lea.

Charles Bonneau, Sacramento, CA, for defendant-appellant Jemerigbe.

Benjamin B. Wagner, Assistant United States Attorney, Sacramento, CA, for plaintiff-appellee.

Before: HOLCOMB HALL, WIGGINS, and LEAVY, Circuit Judges.

WIGGINS, Circuit Judge:

Willie Easter, Paul Jemerigbe, and Ronnie Lea were convicted by a jury of various charges relating to their participation in an armed bank robbery. They raise several issues concerning their joint trial, and Lea also contests his sentence. We affirm the convictions of all three Appellants and we affirm Lea's sentence.

## BACKGROUND

In February 1994, Jemerigbe and Easter were tried by a jury for armed bank robbery, in violation of 18 U.S.C. § 2113, and for using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). Lea was tried at the same time for aiding and abetting these crimes. The three defendants were accused of robbing the American Savings Bank in Stockton, California, on April 24, 1993, with Lea acting as the getaway driver. (Jemerigbe was also charged with, and convicted of, robbing of the same bank just one month earlier, in March 1993.) During the trial, limited testimony was elicited concerning the fact that all three defendants were associated with the same gang, the "Northside Gangsters" ("NSG"). The admitted mastermind behind both robberies, Omie Hartman, was also linked to NSG. After eight days of trial and three days of deliberations, the jury returned guilty verdicts against all defendants.

On appeal, Easter, Jemerigbe, and Lea all argue that the evidence concerning their affiliation with NSG should not have been admitted. Easter and Lea also raise additional arguments. Easter argues that the trial court should have allowed a Government witness to be cross examined on the subject of the witness' failure to register as a sex offender; that the court delivered an impermissibly coercive *Allen* charge; and that the cumulative effect of the various errors requires reversal. Lea argues that there was insufficient evidence to support the firearms charge against him, and that the sentencing court erred by not granting him a downward departure for acceptance of responsibility.

## DISCUSSION

I. *The District Court Did Not Abuse its Discretion by Allowing Testimony That the Defendants Were Affiliated with the Same Gang.*

A. Relevance

■ Decisions concerning the relevance of evidence are committed to the district court's "sound discretion." *United States v. Gilley*, 836 F.2d 1206, 1213 (9th Cir.1988). We hold that the district court did not abuse its discretion by finding the evidence concerning Appellants' affiliation with NSG relevant on the issue of identity.

■ Evidence that Appellants were linked to NSG was relevant on the issue of identity because it helped link them to the mastermind who planned both robberies, and to the first robbery. NSG is a small, 25-member gang. There was testimony that Hartman, who admitted planning both robberies, was an associate of the gang. Accordingly, linking Appellants to NSG also linked them to the planner of the robberies. Furthermore, to help him conduct the first robbery, Hartman recruited only NSG members (Jemerigbe, Larry Boyd, and a juvenile). This made the NSG membership of suspected accomplices in the second robbery even more relevant. Lastly, the getaway car recovered after the first robbery bore the initials "NSG" on the windshield, further enhancing the relevance of NSG affiliation.

Both the Supreme Court and this court have ruled that evidence of gang affiliation is admissible when it is relevant to a material issue in the case. *See United States v. Abel,* 469 U.S. 45, 49, 105 S.Ct. 465, 467–68, 83 L.Ed.2d 450 (1984) (admissible to impeach for bias); *United States v. Santiago,* 46 F.3d 885 (9th Cir.1995) (admissible to show motive for crime); *United States v. Fagan,* 996 F.2d 1009, 1015 (9th Cir.1993) (admissible to buttress policeman's ability to identify defendant). We find that the gang-affiliation evidence in this case was relevant on the issue of identity.

### B. Prejudice versus Probativeness

■ We review for abuse of discretion whether the district court erred in finding the evidence of Appellants' membership in NSG more probative than prejudicial. "The district judge is given wide latitude in determining the admissibility of evidence under this standard." *Fagan,* 996 F.2d at 1015 (citation omitted).

■ In this case identity was a central issue. The robbers wore masks and gloves, and left no fingerprints. Their identities could not be discerned from videotape. The only witness to place Jemerigbe, Lea, and Easter at the scene of the second robbery was Hartman, and he was rigorously cross examined by all three defense attorneys. As Lea's own counsel argued in closing: "[T]he question is ... who committed the robbery?" Accordingly, evidence tending to show identity, such as the gang-related connections between the defendants, the mastermind of the crime, and the getaway car, was very probative.[1]

On the other side of the scale, the prejudicial impact of the gang-affiliation evidence was minimized. Appellants rely on general, and admittedly valid, concerns that simply referring to a defendant as a gang member can cause prejudice in some jurors. In the present case, however, several steps were taken, and others offered, to prevent undue prejudice. These safeguards rendered the evidence of gang membership more probative than prejudicial.

The Government offered to stipulate to Appellants' gang membership. It also submitted a cautionary instruction before trial; it limited its NSG evidence to the initials on the getaway car and to the membership status of the various defendants and witnesses; it refrained from inquiring about the nature of the gang, its history, other members, activities, or Appellants' participation in specific gang activities; it did not emphasize the gang affiliation in its closing argument, but only made a few comments concerning the subject, in the context of the parties' relationships to each other; and it made only one passing reference to gang affiliation (of a witness) in its rebuttal closing.

The district court also took several steps to minimize possible prejudice. It probed potential jurors, during voir dire, on the issue of bias due to gang affiliation; it dismissed three potential jurors who indicated that such evidence might influence their deliberations; it offered to give a cautionary instruction at trial; and it gave a cautionary instruction at the close of the trial.

In light of all the precautionary measures, and the Government's limited questioning concerning gang affiliation, we hold that the gang-affiliation evidence did not "unduly" prejudice Appellants. *See Abel,* 469 U.S. at 55, 105 S.Ct. at 470–71. The district court did not abuse its discretion in finding that the probativeness of this evidence outweighed its potential prejudice.

### C. Prior Bad Acts Evidence

■ Appellants' challenge to the gang-affiliation evidence as impermissible "prior bad acts" evidence is precluded by a recent case in this circuit. In *Santiago,* 46 F.3d at 888–89, this court faced facts similar to those in the present case. The *Santiago* court held that Fed.R.Evid. 404(b)'s prohibition against evidence of prior acts was not implicated, because the evidence was forwarded for its

---

1. This case is thus distinguishable from *Dawson v. Delaware,* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), in which the Supreme Court reversed a death sentence because the gang evi-
dence introduced at trial "was not tied in any way to the murder of the victim." *Id.* at 166, 112 S.Ct. at 1098.

probativeness on the matter of the crime for which the defendant was charged: "[E]vidence is not considered to relate to 'other crimes' if it is 'inextricably intertwined' with, and 'part of the same transaction' as, the crime for which the defendant is charged." 46 F.3d at 889 (citations omitted). In the present case, the evidence of Appellants' gang ties was forwarded by the Government as bearing on the identity of the perpetrators of the crimes charged. Further, in the present case, as in *Santiago*, the Government did not forward "evidence of any specific, wrongful acts by either the [gang at issue] or [the defendants] that are unrelated to [the crime charged]." *Id.* Accordingly, we reject Appellants' Rule 404(b) argument.

II. *The District Court Did Not Abuse its Discretion by Refusing to Allow Defense Counsel to Cross Examine a Government Witness on His Failure to Register as a Sex Offender.*

█ Easter argues that the district court erred by not allowing Lea's counsel to cross examine Cleardis Oliver, a Government witness, on the subject of Oliver's failure to register as a sex offender, as required by California law. Easter argues that Oliver's desire to avoid potential punishment for this failure could have furnished Oliver with a substantial motivation to testify for the Government. We conclude that the jury had ample information from which it could evaluate Oliver's motives and purported biases, however.

It is axiomatic that defendants have a Sixth Amendment right to confront witnesses. It is also true that a witness' potential motives for testifying is a relevant inquiry. *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974); *Burr v. Sullivan*, 618 F.2d 583, 586 (9th Cir.1980). The facts of the present case, however, demonstrate that Oliver's non-registration probably did not provide a motivation for his testimony. Further, any relevance that this evidence may have had was overshadowed by other evidence that was presented to the jury that tended to show, much more strongly than his sex-offender status, that Oliver may have had self-inter-

ested motivations to cooperate with the Government.

█ Trial judges have "wide latitude" in determining the proper scope of cross examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *see also United States v. Lopez*, 885 F.2d 1428, 1438 (9th Cir.1989) ("broad discretion"). Two factors the trial judge can consider are relevance and prejudice. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435; *Lopez*, 885 F.2d at 1438. In the present case, the potential prejudice of describing a witness as a sex offender, who has not registered as such, is obvious. The countervailing relevance, if any, was minimal.

Oliver testified to the district court, out of the presence of the jury, that he was unconcerned with his registration status. Corroborating this testimony, there was no evidence that he ever discussed the matter with the Government, let alone asked for assistance with it. Also bolstering this assertion is the fact that Oliver readily demonstrated a willingness to ask the Government for help in legal matters that did concern him.

At the time of his assistance, Oliver was in violation of his probation. He requested the FBI's aid with the probation department, and they obliged. FBI Agent Safarik called Oliver's probation department, set up a meeting, and subsequently attended that meeting. Oliver's request for FBI assistance with his probation status, but not with his sex-offender status, corroborates his testimony that he was unconcerned with his sex offender status.

Moreover, the jury was presented with evidence of Oliver's request for FBI assistance concerning his probation violation, thus diminishing any evidentiary value his sex-offender status may have held. That is, the jury was explicitly told (both by Oliver and Agent Safarik), that Oliver had asked for the FBI's assistance in a matter that could have led to his reincarceration—precisely the type of bias that Easter argues could have been shown through Oliver's sex-offender status. As this court has recognized, the district court need not allow cross examination into such cumulative evidence: "When the trial

court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness." *United States v. Parker*, 991 F.2d 1493, 1497 (9th Cir.1993) (quotation omitted).

### III. *The District Court Did Not Err in Delivering an* Allen *Charge.*

■ Easter argues that a modified *Allen* charge given by the district court after the jury had deliberated for two days was impermissibly coercive. The district court's decision to give the charge must be upheld unless it is clear from the record that the charge had an impermissibly coercive effect on the jury. *United States v. Lorenzo*, 43 F.3d 1303, 1307 (9th Cir.1995).

■ Easter admits that the charge itself was "mild enough that it would be unobjectionable if it were given when the case was first submitted to the jury," but argues that "the giving of the charge after the jury had declared a deadlock presents a different picture." This ignores the fact that *Allen* charges are almost always given not at the beginning of deliberations, but after the jury has demonstrated an inability to reach a prompt verdict. *See, e.g., Lorenzo*, 43 F.3d at 1305, 1307–08; *United States v. Ajiboye*, 961 F.2d 892, 893 (9th Cir.1992); *United States v. Sae–Chua*, 725 F.2d 530, 531 (9th Cir.1984).

Further, the usual indicia of coercion are absent in this case. Unlike *Sae–Chua*, wherein this court found an *Allen* charge impermissibly coercive, the judge in this case did not know the numerical division of the jury, or even which way the jury was leaning, let alone which way each particular juror was inclined to vote. Accordingly, no juror in this case had any reason to believe that the charge was being leveled at her, or even that the charge was aimed at jurors on one side or the other. *See Lorenzo*, 43 F.3d at 1307–08 (finding an *Allen* charge non-coercive even though judge knew the numerical division of the split [11–1] ).

The only proposed evidence of coercion forwarded by Easter is the fact that the jury reached a verdict four hours after the charge was given (two and a half hours if their lunch break is not included). But this court has found *Allen* charges non-coercive when juries responded more quickly than this. *See, e.g., United States v. Bonam*, 772 F.2d 1449, 1451 (9th Cir.1985) (holding not only that one and a half hours was not proof of coercion, but that it was not "such a short period of time as to raise a suspicion of coercion"); *United States v. Beattie*, 613 F.2d 762, 765–66 (9th Cir.) (finding that three and a half hours does not raise suspicion of coercion), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980). All told, it certainly is not clear from the record that the charge had an impermissibly coercive effect on the jury.

### IV. *Cumulative Errors do not Require Reversal as to Easter.*

Because we reject each of Easter's various claims, we reject his "cumulative error" claim, as well. *See United States v. Gutierrez*, 995 F.2d 169, 173 (9th Cir.1993).

### V. *The Jury's Firearm Verdict Against Lea Was Supported by Sufficient Evidence.*

■ Lea argues that there was insufficient evidence to support his conviction for aiding and abetting armed bank robbery, and aiding and abetting the use of firearms during a crime of violence. The crux of Lea's argument is that there was not sufficient evidence that he knew that the other defendants were going to use guns during the bank robbery. The jury's verdict must be sustained if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Lea's challenge to the sufficiency of the evidence fails this test.

Lea relies heavily upon *United States v. Dinkane*, 17 F.3d 1192 (9th Cir.1994), but this reliance is misplaced. In *Dinkane*, this court held the evidence of aiding and abetting an armed robbery insufficient where "[t]here was ... no evidence that prior to the robbery [the defendant] knew that the principals had and intended to use weapons." *Id.*

at 1198. In the instant case, in contrast, Hartman testified that the night before the robbery he had discussed with Easter and Lea the fact that guns would be present during the robbery. Further, Hartman testified that Lea was in the car with him and the other two robbers on the way to the bank. During this trip Jemerigbe and Hartman discussed, and resolved, the question of which one of them would carry a gun into the bank. And after deciding that it would be Hartman, Jemerigbe gave Hartman the gun. A rational jury could infer, based upon the conversation the night before the robbery, and Lea's opportunity on the way to the bank to overhear a discussion about who was going to carry the guns, and to see at least one of the guns, that Lea knew the robbery was going to be an armed one.

## VI. *The Sentencing Court Did Not Err by Not Granting Lea a Downward Departure for Acceptance of Responsibility.*

 Lea argues that the district court erroneously believed that it lacked discretion to grant him a downward departure for acceptance of responsibility, because he did not plead guilty, but instead put the Government to its burden of proof at trial. We affirm the denial of the downward departure.

The district court did not deny Lea the downward departure because Lea failed to plead guilty. Rather, the district court explained: "[T]he timing of circumstances of defendant's admission makes it under the commentary inappropriate for the court to consider that there has been an admission." The district court was correct. The timing of Defendant Lea's admission did make the downward departure for acceptance of responsibility inappropriate.

Application note 2 to U.S.S.G. § 3E1.1 (Nov. 1992) states, in part: "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential elements of guilt, is convicted, and only then admits guilt and expresses remorse." The note goes on to explain, however, that conviction by trial does not automatically preclude a downward departure. Rather, in "rare situations" a defendant will be able to "clearly demon-strate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." The note emphasizes, however, that the timing of the defendant's admission is indeed critical: "[A] determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."

A recent case cited by Lea demonstrates a "rare situation" in which a defendant exercised his right to trial, yet by his pre-trial statements and conduct demonstrated an acceptance of responsibility for his actions. In *United States v. McKinney*, 15 F.3d 849 (9th Cir.1994), the defendant had waived his *Miranda* rights and confessed to the police, during which time he was "cooperative and remorseful." *Id.* at 850. The defendant assisted the authorities and even attempted to plead guilty. When this offer was rebuffed, he "put on the most minimal and perfunctory of defenses. He did not raise an affirmative defense or even put on a witness to contest a material part of the Government's case." *Id.* at 852. This court noted, concerning "the timeliness of the defendant's conduct manifesting acceptance of responsibility," that the defendant's confession and assistance started "immediately." *Id.* at 853 (citing U.S.S.G. § 3E1.1 cmt. 1(g) (1991)). The court concluded that "McKinney's confession, assistance to authorities and attempts to plead guilty make his sincere contrition clear beyond all measure." *Id.* Accordingly, the court held that McKinney was entitled to the downward departure.

*McKinney,* rather than supporting Lea's position, underscores why it is without merit. Unlike McKinney, who manifested an acceptance of responsibility at the first available moment, Lea has forwarded no proof whatsoever that he manifested such an acceptance at any time prior to the sentencing process. Only after putting the Government to its burden of proof at trial, after being interviewed by a Probation Officer, and after the subsequent draft of the presentence report was prepared, did Lea write a letter acknowledging his guilt and apologizing for his actions. This case is the paradigmatic case addressed by application note 2 to Section 3E1.1. Although *McKinney* demonstrates

what the note itself acknowledges, that there may be "rare situations" where defendants go through a trial and are nevertheless entitled to a downward departure, *McKinney* did not (and could not) read the note out of the Guidelines. *United States v. Anderson,* 942 F.2d 606, 612–14 (9th Cir.1991) (en banc) ("[W]e hold that courts shall: (1) consider the guideline and commentary together," disregarding the commentary only if it is not possible to construe it consistently with the guideline). Accordingly, we affirm the district court's refusal to grant this departure.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgments against Jemerigbe, Lea, and Easter, as well as Lea's sentence.