**Jennifer Gayle LEAHY, Petitioner,**

v.

**Teena FARMON Warden, Respondent.**

No. C 97–1407 PJH(PR).

United States District Court,
N.D. California.

Oct. 26, 2001.

Michael A. Bannister, Catherine A. Rivlin, CA Attorney General's Office, San Francisco, CA.

Jennifer Gayle Leahy, Central CA Womens Facility, Chowchilla, CA.

Richard Craig Kesser, CSP-Los Angeles County, CA State Prison-Los Angeles County.

William Weiner, Law Offices of William Weiner, San Franciso, CA.

### ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

HAMILTON, District Judge.

This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse.[1] The matter is submitted.

---

1. Respondent filed a notice of related case stating that this case is related to C 96–3452 PJH, *Kesser v. Cambra,* in which petitioner's co-defendant is the petitioner. The Court determined that the notice was moot because both cases were assigned to the same judge. Both cases were later reassigned to the under-

## BACKGROUND

Petitioner was convicted by a jury of first degree murder with special circumstances. She was sentenced to prison for life without possibility of parole. Her conviction was affirmed by the Court of Appeal of California, Ex. E, and the Supreme Court of California denied review, Ex. G–1.[2] As grounds for habeas relief she asserts that: (1) The prosecutor used peremptory challenges to discriminate against a native American prospective juror, in violation of *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and (2) her rights to due process and an unbiased jury were violated when the trial court refused her motion for a change of venue.

Defendants Stephen Duane Chiara, Richard Craig Kesser and Jennifer Gayle Leahy were convicted of the first degree murder of Kesser's former wife. As the Court of Appeal of California put it: "The prosecution theory was that Kesser, an angry and bitter ex-husband[,] plotted with Leahy, his fiancee, to hire Chiara, an acquaintance of Leahy's, to kill Kesser's former wife Mary in order to collect the proceeds of her insurance policy." Ex. E at 2. Petitioner's theory of defense was that although she was involved in a plan to hire Chiara, she thought the plan was to hire him· to blow up his ex-wife's car, not to kill her. *Id.* at 9. An extensive summary of the evidence in trial court, none of which is disputed for purposes of this petition, which involves only pretrial matters, can be found in the opinion of the Court of Appeal. *Id.* at 2–10.

## DISCUSSION

### A. *Standard of review*

■ The petition in this case was filed after the effective date of the Antiterror-

ism and Effective Death Penalty Act of 1996 (AEDPA), so the provisions of that act apply to it. *See Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under the AEDPA a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

■ A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1518, 1523, 146 L.Ed.2d 389 (2000). A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of § 2254(d), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at

---

signed, so that remains true. The Court has granted Petitioner's request to join in the traverse filed by counsel in *Kesser* in so far as it applies to Petitioner's two issues.

**2.** All "Ex." citations are to the record lodged by Respondent at the request of the Court.

1522. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 1521–22. The writ may be granted under the "unreasonable application of" clause only when the court's "independent review of the legal question does not merely allow [the court] ultimately to conclude that the petitioner has the better of two reasonable legal arguments, but rather leaves [the court] with a 'firm conviction' that one answer, the one rejected by the [state] court, was correct and the other, the application of the federal law that the court adopted, was erroneous—in other words that clear error occurred." *Tran v. Lindsey,* 212 F.3d 1143, 1152–54 (9th Cir.2000).

As to issues of fact, under 28 U.S.C. § 2254(d)(2) a federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Torres v. Prunty,* 223 F.3d 1103, 1107 (9th Cir.2000) (quoting 28 U.S.C. § 2254(d)(2) and *Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495). The "clearly erroneous" standard of unreasonableness that applies in determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in determining the "unreasonable determination of the facts in light of the evidence" under § 2254(d)(2). *See id.* at 1107–08 (citing *Van Tran,* 212 F.3d at 1153–54). To grant relief under § 2254(d)(2), a federal court must be "left with a firm conviction that the determination made by the state court was wrong and that the one [petitioner] urges was correct." *Id.* at 1108 (quoting *Van Tran,* 212 F.3d at 1153–54) (internal quotation marks omitted).

■■■ A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correct-

ness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Bragg v. Galaza,* 242 F.3d 1082, 1087 (9th Cir.), *amended,* 253 F.3d 1150 (9th Cir.2001). A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Id.*

**B. *Issues Presented***

**1. *Batson issue***

**a. *Standard***

■■■ The use of peremptory challenges by either the prosecution or defendant to exclude cognizable groups from a petit jury may violate the Equal Protection Clause. *Georgia v. McCollum,* 505 U.S. 42, 55–56, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* sets up a three-step process for a trial court's ruling on objections to peremptory challenges which the defendant asserts are racially motivated. First, the defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. *Id.* at 96–97, 106 S.Ct. 1712. Second, if the requisite showing is made, the prosecutor must articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97–98, 106 S.Ct. 1712. Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Id.* at 98, 106 S.Ct. 1712. In evaluating the race or gender neutrality explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez v. New York,* 500 U.S. 352, 355–62, 111 S.Ct. 1859, 114

L.Ed.2d 395 (1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony).

A federal habeas court need not dwell on the first step of the *Batson* analysis when, as here, the matter has proceeded to the second or third step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859; *cf. Stubbs v. Gomez,* 189 F.3d 1099, 1104 (9th Cir.1999). "Whether the justification offered by a prosecutor is an adequate race-neutral explanation is a question of law." *United States v. Bishop,* 959 F.2d 820, 821 n. 1 (9th Cir.1992). The findings of the trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. *See Purkett v. Elem,* 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

b. *Discussion*

Petitioner argues three points in support of her *Batson* claim. First, she argues that the trial court erred at the second *Batson* step by failing to recognize that at least one of the reasons set forth by the prosecutor was not race-neutral. Traverse at 6. Second, she argues that the presence of even one non-neutral reason constitutes a *Batson* error. Traverse at 6. Third, petitioner claims that even if there was no error at the second step, there was error at third step because the prosecutor failed to rebut the prima facie case of racial bias. Traverse at 8.

Petitioner is partly right. The trial court did commit serious error in failing to recognize the bias inherent in one of the prosecutor's purportedly neutral reasons. However, the Court of Appeal recognized this error. Because its analysis of that error and its effect cannot be said to have resulted in a decision contrary to "clearly established Federal law," habeas relief is not warranted.

i. *Prosecutor's failure to set forth race-neutral reasons*

During voir dire defense counsel challenged the prosecutor's use of peremptory strikes. *People v. Chiara et al.,* No. A060502, slip op. at 17 (Cal.Ct.App. Dec. 12, 1995) (Pet.Ex.E). The trial court concluded that a cognizable group of Native Americans had been excluded, and asked the prosecutor to explain his reasons for striking them. *Id.* The Court of Appeal correctly concluded that the trial court's finding that a cognizable group had been excluded and its request that the reasons be explained was an implied finding that a prima facie case had been made. *Id.; see Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859 (once the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot). Thus, there was no error by either the trial court or the Court of Appeal in moving to the second step.

The second step, in which the party exercising the peremptory challenges must come forward with a race neutral explanation for them, is more problematic. The three Native American jurors that petitioner claims were wrongfully challenged are named Rindels, Lawton and Smithfield.[3] As will be seen, the prosecutor's

**3.** The petition is ambiguous as to whether the *Batson* claim is intended to apply only to juror Rindels or to all three Native American prospective jurors. In the portion labeled

explanation for his challenge of prospective juror Rindels raises serious concerns.[4] The portions of the reporter's transcript relevant to the challenge of prospective juror Rindels are set forth below. In response to the trial court's request for an explanation of his challenges, the prosecutor stated:

> MR. DIKEMAN [prosecutor]: Well, if I might proceed with the Court's permission in my own fashion.
>
> THE COURT: All right.
>
> MR. DIKEMAN: I would like to explain a number of things about my use of the voir dire process and peremptory challenges. In selecting a jury or a juror, I'm essentially looking for five things. Number one, is this someone who can be fair to the People or do they come to this proceeding with some sort of bias against law enforcement or against the criminal justice system. Number two is it someone who can judge someone else and who is strong enough to make a decision and return a verdict of guilty. Number three, is this someone who will listen to me or is this someone who for some reason finds me offensive. I know that may be difficult for the Court to accept, but there's some people who don't immediately take a shine to me, and to whom I have kind of an abrasive personality. Number four, is this someone that the defense has been allowed to get their hooks into through the questioning or as I referred to once in this proceeding, the bonding between the potential juror and the defense attorney. And number five, is this one who is capable of getting along with the other eleven jurors.
>
> There really is no rhyme or reason to the use of the peremptory challenge. These are general categories. Sometimes they will apply and sometimes they won't apply. The way this has proceeded, if I am fortunate to form any impression about these people, some of them I've seen three times. I saw them at the hardship, I saw them during the individual questioning by the Court, and then they came to court the other day and pretty much just sat there. The jury selection process has gone on since

---

"Claim One" Petitioner refers to "racially discriminating against Native Americans," use of the plural perhaps suggesting that she bases the claim on the strikes of all three. But in the "Supporting Facts" portion she refers only to Rindels. She also says "See attached Petition for Review to California Supreme Court" in the "Supporting Facts" section. The Petition for Review raised only the Rindels strike. Resp. Answer, attached Ex. G at i, 2–13. Although Petitioner has been allowed to join in the traverse filed by Kesser's counsel in his habeas case, and that traverse clearly addresses *Batson* claims as to the other native Americans who were stricken, a habeas claim cannot be raised for the first time in a traverse. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994).

Also, because her petition for review in the Supreme Court of California raised only the Rindels strike, Petitioner has exhausted only as to that claim. *See* 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509, 515–16, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (habeas petitioners must exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court). As will be discussed further below, there clearly was not a *Batson* violation as to the other two Native American jurors, so although any *Batson* claims as to them are not exhausted, to whatever extent such claims are raised in this Court they can be and will be denied. *See* 28 U.S.C. § 2254(b)(2).

4. Because the challenges of Lawton and Smithfield do not necessarily raise these concerns, they will be discussed separately, following the conclusion of the Rindels discussion.

approximately the 7th of July. During the hardship I made notes on the questionnaire. When we got the long questionnaire I reviewed it and summarized it on a one piece legal pad page, and then noted additional observations or impressions during the course of voir dire and during the voir dire by other counsel. I don't believe I asked very many questions of any of the prospective jurors and I never really had a chance to interact with them in any fashion, and I gave grades to the jurors, from a high of A to the low of an F. Sometimes they were minuses, sometimes they were pluses, sometimes they went from numerical grade to a plus.

On those occasions when Inspector Jager was present he also graded the jurors and we then had the opportunity to confer and try and decide whether or not jurors we had on were or were not the kind of people that we were looking for in this particular panel.

As to the individuals that I excluded—and my notes would indicate that in the selection of the first twelve I exercised seventeen peremptory challenges and coincidentally the last was against a younger white male whose name happened to be Wheeler. And I don't know how that posed.

I would like to go through each one of them and explain to the Court the grade that I gave them, the notes that are on my juror cards, the reasons, if I'm able to present them to the Court, why I excluded these people, because don't think you can simply look and say you excluded these four, tell us why. I think that the Court should have something to balance that against and that's the reasons I exercised any of these peremptory challenges, and then the Court can determine whether or not the grades that I gave these people fell within the range of grades that I gave the other people that I excluded from the panel.

And if that's permissible, I'm prepared to do that, and then specifically I can address these four and perhaps go into a little more detail about why it was I kicked those people out.

THE COURT: Well, let's talk about the four first. If I think I need something more I'll certainly allow you to go through all of them, but why don't we start with Rindels first.

MR. DIKEMAN: Miss Rindels was the one darker skinned female from the regular panel or the group of seventeen that I challenged. My notes indicate that she was my second peremptory challenge. My first was exercised against and [sic] older white male. Miss Rindels my notes indicate—the grade I gave her was a C. She was a younger, middle-aged native American female, Trinidad eight years, Humboldt County twenty-five years. She came to the July 29th hardship. She claimed a hardship because she was in the process of completing an application for HUD funding, which was very important I guess to her, and she was the office manager for an indian tribe and had been for twelve years. Married fourteen years. Her husband was a foreman for a roofing company, two kids, eighteen and twelve. Her sister worked for Bill Bertain. Her younger sister had been divorced, it was a particularly messy divorce. Someone had been involved with the criminal justice system. That person turned out to be her older daughter. The suspect in that case was her actual father who did a very short period of time apparently in custody. I note that she was a little chubby. I have a note here that says "perm." I don't know what that means. Still a bit emotional and misty. She teared up when she

talked about the experience involving her daughter and her father, and she was in Washington for a vacation for a couple of months in late 1991 and had no—no recollection of anything here. She works for the tribe, and when we talk about native Americans in Humboldt County, we're talking essentially about two tribes or separate nations, the Hupa and Yurok.

My experience is that native Americans who are employed by the tribe are a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system, and my experience is that they are sometimes resistive of the criminal justice system generally and somewhat suspicious of the system.

She was pretentious in my mind and self-important with the thought that only she could complete the necessary paperwork which would get the grant. She was emotional about the system as I indicated before. Her daughter had been molested by her father, and for that reason I'm assuming that the living situation was indicative of something of a dysfunctional family. I viewed her as somewhat unstable, fairly weak, and somebody who I thought would be easily swayed by the defense.

THE COURT: Okay. Next?

Ex. H, Vols. 13–14, at 3374–79.

The prosecutor then discussed his challenge to the other jurors to whose exclusion a *Batson* challenge had been made (discussed below). *Id.* at 3379–83. The court then called upon defense counsel:

MR. BRAGG [counsel for defendant Kesser]: Your Honor, I believe that the expressed concern that Mr. Dikeman had, particularly Miss Rindels, is a classic example of what the Court— in fact would be used by the appellate courts as a basis for exclusion, because it's a presumption of a group bias based on a stereotype membership in a racial group, and I think that—

THE COURT: I don't believe that's what it said.

MR. BRAGG: That's what I heard. Native Americans that work for tribes, and feel alienated and are not willing to accept the—what is perceived to be the wide judicial system and the ethics and the legal requirements that are imposed on them by that system. This is a stereotype that is placed upon that lady because she happens to be an indian and a member of the tribe. That's exactly what it says as far as—that's what I heard him say, and I think that would be pegged by the appellate courts as being exactly the type of impermissible stereotyping that makes that type of peremptory unconstitutional.

MR. DIKEMAN: I would—

THE COURT: Wait a minute, I want to hear from defense counsel first.

MR. DIKEMAN: If I could say one thing on that aspect, in this county we've had Dr. Roy Alsop come in here and explain to the courts and I've seen this on the criminal calendar, child molesting is okay in certain native American cultures, and we can't treat native American child molesters the same way we treat other child molesters, and have to treat them through the indian culture center and there are a whole bunch of people that violate our laws that are native Americans and they go much more often through the native American system than the criminal system, and to say that does not exist is frankly incorrect. Dr. Alsop went to San Francisco and testified in the Troy case which resulted in the acquittal on a charge of murder, because there was some sort of racial bias that lasted for a

long time in Siskiyou County and accounted for the killing of a police officer.

MR. BRAGG: The fact there may be some cultural—unique cultural aspects to a person's background is not a basis for exclusion. Assuming everything that he has said is correct, that still wouldn't be a basis for exclusion of a native American indian, even of a child molest case, because the defendants have the constitutional right to the cross-section of the community and that's the constitutional right involved. You can't exclude a person because of their cultural background, and Roy Alsop is not here, he's not qualified as an expert to talk about indian culture or the particular perspectives in life. It's not a child molest case. I know Roy Alsop has been quoted on record as saying he can touch a pregnant indian stomach and womb and determine whether there's a problem in there psychically, so this particular gentleman has been cited as an expert, certainly would be viewed by many people in the mainstream as having some problems with his particular approach, and it's not necessarily reflective of the American indian culture or beliefs.

MR. SANDERS [counsel for defendant Leahy]: I think simply the district attorney's comments having to do with Miss Rindels is just established the group bias that he has, statements concerning his belief in Mr. Alsop's testimony which appears to be highly incredible, and reinforces the fact he does have a group bias, and I would be joining in Mr. Bragg's comments and his points and authorities.

MR. PARSONS [counsel for defendant Chiara]: I don't think Mr. Bragg com-

pleted his comments and when he does—

THE COURT: I thought—I'm sorry, Mr. Bragg, is there anything else?

MR. BRAGG: I'm done.

MR. PARSONS: I would be joining in Mr. Bragg's comments as well and Mr. Sanders.

MR. BRAGG: Well, I've gone through everything that Mr. Dikeman has indicated with regard to the other jurors. It had very little to do with the five criteria he listed initially. Bias against the people as I pointed out in my points and authorities, when you look at the qualifications and these particular people, three out of four very very strong law enforcement connections. They can hardly be viewed as defendants' jurors, in fact I think they would be biased for the People, if anything—biased in favor of the People.

His comments with regard to everything else that he really is claiming as a basis for excusing these people has nothing to do with the five criteria that he offered.

THE COURT: All right. The Court finds there is sufficient justification to support the peremptory challenges. With regard to Miss Rindels, my understanding of what Mr. Dikeman said is that—one of them is at least that she worked for the tribe, not because she was one of the tribe, but she worked for the tribe. That's entirely different, other than the fact if she's indian, if she is. I gather that she is.

Ex. H, Vols. 13–14 at 3384–87.

Thus, the trial court concluded that the prosecutor's reasons for striking prospective juror Rindels were race-neutral. Like the Court of Appeal, this court agrees that four of those reasons clearly were [5]: (1)

---

**5.** At this second step of the *Batson* analysis the explanation need not be "plausible," and

may even be "silly or superstitious;" it only

she was "pretentious in my mind and self-important;" (2) she was emotional about the system as a result of her daughter's involvement in a family child molestation case; (3) her indication that her daughter had been molested by her father suggested "something of a dysfunctional family;" and (4) the prosecutor "viewed her as somewhat unstable, fairly weak, and somebody who I thought would be easily swayed by the defense." Ex. H, Vols. 13–14 at 3378.

The question is whether a fifth reason the prosecutor identified for striking prospective juror Rindels is also race-neutral. Specifically, the prosecutor said:

My experience is that native Americans who are employed by the tribe are a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system, and my experience is that they are sometimes resistive of the criminal justice system generally and somewhat suspicious of the system.

Ex. H, Vols. 13–14 at 3378.

Counsel for codefendant Kesser argued that his interpretation of this statement— that Native Americans "are not willing to accept ... what is perceived to be the wide judicial system and ethics and the legal requirements that are imposed on them by that system"—was "exactly the type of impermissible stereotyping that makes that type of peremptory unconstitutional." Ex. H, Vols. 13–14 at 3384. Counsel for petitioner joined in this objection. The prosecutor interrupted, asking to "just say one thing on that aspect," and

then proceeded to *confirm* the accuracy of petitioner's interpretation. After claiming that he had heard expert testimony in other cases to the effect that "native American child molesters" should not be treated like other child molesters, the prosecutor stated:

[T]here are a whole bunch of people that violate our laws that are native Americans and they go much more often through the native American system than the criminal system, and to say that does not exist is frankly incorrect.

Ex. H, Vols. 13–14 at 3385.

"A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859. Clearly, this explanation does not satisfy that test. The prosecutor's reason applied only to Native Americans ("native Americans who are employed by the tribe...."), and depended on a cultural/racial stereotype. It cannot be said that this was a race-neutral reason for the strike.[6]

Thus, the trial court erred in this regard. However, the Court of Appeal did not. Indeed, it recognized that the employment reason was not race-neutral, noting that petitioner was justified in arguing that "the underlying assumption that Native Americans as a group are 'anti-establishment' is itself based on racial stereotype." Ex. E at 19. Thus, according to the Court of Appeal's review of the record, the prosecutor identified four race-neutral

---

must not be based upon race. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769.

**6.** This might have been a closer issue if only employment with the tribe were at issue, because nothing in the record establishes that only Native Americans are employed by the tribe. The stereotype of Native Americans as "resistive of the criminal justice system generally and somewhat suspicious of the system"

would still be a concern. But the prosecutor's limitation of his suspicions to Native Americans who are employed by the tribe allows no other conclusion than that the challenge was based on race. *See Stubbs,* 189 F.3d at 1106 ("a 'generic reason[ ][or] group-based presumption [ ] applicable in all criminal trials' to members of a minority is not race-neutral.") (quoting *Bishop,* 959 F.2d at 825).

reasons, and one non-race neutral reason for challenging prospective juror Rindels.

### ii. Does the presence of a non-race neutral reason compel a finding of Batson error?

 Petitioner argues that the presence of a single non-race neutral reason renders other race-neutral reasons irrelevant.

The Supreme Court has yet to address the question of whether the existence of a single discriminatory reason for a challenge results in an automatic *Batson* violation despite the existence of other race-neutral reasons. Decisions from various circuits establish that the answer is anything but clear. In particular, circuits that have adopted the "dual motivation" analysis [7] recognize that "A person may act for more than one reason" and that when a prosecutor offers both legitimate and illegitimate reasons for a strike, further analysis is required. *Howard v. Senkowski*, 986 F.2d 24, 26 (2d Cir.1993).

The Court of Appeal, relying on Ninth Circuit authority, explicitly rejected petitioner's argument that the presence of a single discriminatory reason ends the court's inquiry:

> Defendants' citation of *U.S. v. Bishop, supra*, 959 F.2d 820, for the proposition that once a single improper reason for a peremptory challenge appears, the appellate court must halt its inquiry and reverse, is a blatant distortion of the holding in that case. On the contrary, after determining that the prosecutor used a race-based justification as to one of the jurors, the Ninth Circuit in *Bishop* in fact went on to consider the prosecutor's other asserted reasons. Because the prosecutor left on the jury other panel members who possessed the allegedly objectionable characteristics, the court determined that those other reasons were makeweights and that the prosecutor had not met his burden of articulating a race-neutral explanation. (*Id.* at p. 827).

Ex. E at 19. That is, the Court of Appeal's reading of *Bishop* was that when both race-based and racially-neutral reasons for a strike are given at the second *Batson* step, the court should not stop its analysis because a race-based reason has been given, but should go on to consider the race-neutral reasons.[8]

---

7. Several circuits have adopted a dual motivation analysis for *Batson* claims. *See, e.g., Weaver v. Bowersox*, 241 F.3d 1024, 1032 (8th Cir.2001); *Wallace v. Morrison*, 87 F.3d 1271, 1274–75 (11th Cir.1996); *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir.1995); *Howard v. Senkowski*, 986 F.2d 24, 26–30 (2d Cir.1993). In dual motivation analysis, if the trial court finds that the proponent of the strike has articulated both racially-based and race-neutral reasons for the strike (i.e., dual motivation), the proponent then may attempt to show that the strike would have been exercised even in the absence of any discriminatory motivation. *Wallace*, 87 F.3d at 1274–75; *Weaver*, 241 F.3d at 1032; *Howard*, 986 F.2d at 30. A trial court's ruling that a strike was not improper can be an implied finding that the proponent of the strike has carried his or her burden under this standard. *Wallace*, 87 F.3d at 1275; *Weaver*, 241 F.3d at 1032.

Applying dual motivation analysis to *Batson* challenges may seem inappropriate based upon the Supreme Court's holding in *Batson* itself, which was: "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors *solely* on account of their race...." *Batson*, 476 U.S. at 89, 106 S.Ct. 1712 (emphasis added). The argument that a *Batson* violation occurs only when the motivation for the strike was "solely" race has been justly criticized, however. *See Howard*, 986 F.2d at 27–30. In this case, application of a "solely" standard would result in failure of the *Batson* claim, because it is clear the state courts found that the Rindels strike was not motivated solely by a discriminatory motive, and that finding is not unreasonable.

8. After finding an impermissible motivation, the Ninth Circuit in *Bishop* did, as the Court of Appeal states, go on to address the considerations other than race articulated by the

As noted previously, the adequacy of a race-neutral explanation "is a question of law." *Bishop*, 959 F.2d at 821 n. 1. To succeed petitioner must show that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The decision of the Court of Appeal that the second step of the *Batson* analysis can be met by articulating both race-based and race-neutral reasons for a strike is not contrary to or an unreasonable application of, United States Supreme Court precedent. That is, there is no United States Supreme Court authority holding that articulation of one race-based reason for a strike, along with several race-neutral reasons, requires reversal at the second *Batson* step.

### iii. *Analysis of Bias*

 Finally, petitioner argues that the facially neutral reasons give by the prosecutor were merely pretextual for his real purpose of racial bias. In the third *Batson* step the trial court must determine whether the opponent of the strike has carried his or her burden of proving "purposeful discrimination." *Batson*, 476 U.S. at 98, 106 S.Ct. 1712.

As an initial matter, there is the question of exactly what is required to establish purposeful discrimination. As will be seen, the California Court of Appeal looked at whether racial bias was the "predominant" or "primary" reason motivating the challenge. As noted above, a number of circuits have adopted a dual motivation analysis in situations where a prosecutor

identifies both legitimate and illegitimate reasons for a strike. As explained by the Second Circuit, dual motivation analysis supplements traditional stage three *Batson* analysis in that once the claimant shows discriminatory motivation, "the accused party has an opportunity to show that there were really two motives and that a permissible motive would have led to the challenged action." *Howard*, 986 F.2d at 27. The Ninth Circuit has not adopted dual motivation analysis. *Johnson v. Vasquez*, 3 F.3d 1327, 1329 n. 2 (9th Cir.1993) ("We express no opinion on the issue of whether a mixed-motive defense in Batson jury challenge cases is a valid one."). Thus, in a case where the Ninth Circuit was presented with facially neutral reasons but contextual explanations that gave "strong indications" that a challenge was in fact racially based, the court held that "the burden remains with [the claimant] to show that these . . . reasons were pretextual and that the true reason for the challenge was racial." *Id.* at 1330 n. 4; *see also United States v. Alcantar*, 897 F.2d 436, 440 (9th Cir.1990) ("Where both legitimate and illegitimate reasons are offered by the prosecution, the need for a meaningful adversary hearing to discover the true motivation behind the challenges is especially strong."); *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987) (court notes that prosecutor, in camera, revealed both neutral and illegitimate reasons and that because defendant was unable to challenge, prosecutor had no chance to "dispel the inference that she acted from improper motives."). While the meaning of "true reason," "true moti-

---

prosecutor. *Bishop*, 959 F.2d at 827. However, rather than just noting the presence of the neutral reasons, it appears the court considered whether the racially-neutral reasons were "persuasive" at the second step. *Id.* *Bishop* was decided before the United States Supreme Court decision in *Purkett v. Elem*, in which the Court warned against "combining

*Batson's* second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive . . . ." *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769. Regardless, the fact remains that in the face of an impermissible reason, the *Bishop* court still considered the prosecutor's additional neutral reasons.

vation" or "acting from improper motives" is not entirely clear, in light of this precedent (and without contrary Supreme Court authority), it cannot be said that an interpretation which requires the wrong reason to be the "primary" or "predominant" reason is contrary to clearly established Federal law.

 The state court findings on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. *See Purkett,* 514 U.S. at 769, 115 S.Ct. 1769. This court may grant the writ only if it concludes that the state court's adjudication of the claim resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Torres v. Prunty,* 223 F.3d 1103, 1107 (9th Cir.2000) (quoting 28 U.S.C. § 2254(d)(2) and *Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495). To grant relief under § 2254(d)(2), a federal court must be "left with a firm conviction that the determination made by the state court was wrong and that the one [petitioner] urges was correct." *Id.* at 1108 (quoting *Van Tran,* 212 F.3d at 1153–54) (internal quotation marks omitted). The presumption of correctness accorded to state courts' factual findings adheres to appellate as well as trial court determinations of fact. *See Cabana v. Bullock,* 474 U.S. 376, 387 n. 4, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986); *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982)[9]; *Hayes v. Kincheloe,* 784 F.2d 1434, 1437 (9th Cir.1986). To rebut this presumption, petitioner must show error by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The trial court found "sufficient justification to support the peremptory challenges. With regard to Miss Rindels, my understanding of what Mr. Dikeman said is that—one of them is at least that she worked for the tribe, not because she was one of the tribe, but she worked for the tribe. That's entirely different, other than the fact if she's indian, if she is. I gather that she is." Ex. H, Vols. 13–14 at 3387. As noted above, this was error. The prosecutor's point was not that she "worked for the tribe," but that he had exercised the strike (in part) because she was a "native American[ ]" who worked for the tribe. Given this error, petitioner has rebutted the presumption of correctness as to this finding by clear and convincing evidence— that of the transcript itself.

This does not end the matter, however, because the Court of Appeal, which did recognize the discriminatory reason set forth by the prosecutor, also performed an analysis of the prosecutor's ultimate motivation in making the strike. The court stated that if the improper ground were "the only or primary reason given by the prosecutor, we would have some cause for concern. However, the prosecutor gave many more reasons for his evaluation of Mrs. Rindels as a poor juror other than the statement cited." Ex. E at 19. The court then cited the race-neutral reasons set out above, and stated that it is consti-

**9.** The *Sumner* opinion commented on the application of the presumption of correctness to state appellate court findings at some length, and in a manner relevant to this case:

Section 2254(d) applies to a case in which a state court of competent jurisdiction has made "a determination on the merits of a factual issue." It makes no distinction between the factual determinations of a state trial court and those of a state appellate court. Nor does it specify any procedural requirements that must be satisfied for there to be a "hearing on the merits of a factual issue," other than that the habeas applicant and the State or its agent be parties to the state proceeding and that the state-court determination be evidenced by "a written finding, written opinion, or other reliable and adequate written indicia."

*Sumner,* 449 U.S. at 546–47, 101 S.Ct. 764.

tutionally permissible to challenge a juror on such grounds. *Id.* Based upon this review of the record, the court said "the trial court could reasonably have found, based on several race-neutral explanations, that the prosecutor's 'predominant motive' in excluding juror Rindels was not ethnic or racial bias." *Id.* at 20.

More importantly, the Court of Appeal itself found that race was not the "primary reason given by the prosecutor." *Id.* at 19. This finding is a *Batson* third-step finding that the prosecutor was not motivated by discriminatory intent and was not an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," given the numerous race-neutral reasons for the strike provided by the prosecutor.

As noted above, the Court of Appeal recognized four other reasons offered by the prosecutor for the Rindels challenge: (1) she was "pretentious in my mind and self-important;" (2) she was emotional about the system as a result of her daughter's involvement in a family child molestation case; (3) her indication that her daughter had been molested by her father suggested "something of a dysfunctional family;" and (4) the prosecutor "viewed her as somewhat unstable, fairly weak, and somebody who I thought would be easily swayed by the defense." Ex. H, Vols. 13–14 at 3378; Ex. E at 19.

The prosecutor's impression that Rindels was "pretentious" and "self-important" was based upon her representation that as part of her job, she was "completing an application for HUD funding" and that she "thought that only she could complete the necessary paperwork." Ex. H, Vols. 13–14 at 3378. Indeed, Ms. Rindels stated on her juror questionnaire that she was the "only qualified individual" able to

complete the paperwork. Bragg Decl., Ex. A. Petitioner argues that the paperwork was due July 31, 1992, and thus was not a valid issue when Ms. Rindels was excluded on September 8, 1992. Traverse at 15. But the prosecutor was not pointing to the existence of the paperwork, but rather his impression of Ms. Rindels from her remarks concerning the paperwork.

The prosecutor noted that Ms. Rindels was emotional about the legal system and came from a dysfunctional family because her daughter had been molested by a family member. Ex. H, Vols. 9–10 at 2245–46. The prosecutor's belief that Ms. Rindels was emotional was supported by the fact that she "became tearful" while talking about the molestation. Finally, the prosecutor stated his opinion that Ms. Rindels might be easily swayed by the defense.

The Court of Appeal found that these reasons "are based upon individual predilections supported by the record." Ex. E at 20. This court's review of the record confirms that.

Petitioner responds by pointing to other jurors who purportedly suffered from the same defects yet were not challenged by the prosecutor. Traverse at 17–18. Thus, petitioner cites to answers provided on other jurors' questionnaires which are purportedly equivalent to Ms. Rindels' "only qualified individual" comment. Traverse at 17.[10] Unfortunately, the record does not necessarily support petitioner. For instance, while it is true that juror Dutra stated he had "twenty men working for" him, he gave this answer in describing his job, and was not using it to justify a hardship exception (like Ms. Rindels). Bragg Decl., Ex. H. Juror Scheutzle did say that she was the only person handling specific jobs, she added the qualification that she

---

**10.** Petitioner similarly points to two jurors whose answers indicate (according to petitioner) that they have dysfunctional families or may be swayed by the defense.

"didn't know if that is considered a problem in the eyes of the courts" and explained that her "biggest problem" was her responsibility as a single parent. Bragg Decl., Ex. L.

Moreover, even if petitioner's claims had more support in the record, she would not necessarily prevail.

> Batson is [not] violated whenever prospective jurors of different races provide similar responses and one is excused while the other is not .... counsel is entitled to take account of the characteristics of the other prospective jurors against whom peremptories might be exercised; to reevaluate the mix of jurors and the weight he gives to various characteristics as he begins to exhaust his peremptories; and to take into account tone, demeanor, facial expression, emphasis—all those factors that can make the words uttered by the prospective juror convincing or not.

*Burks v. Borg,* 27 F.3d 1424, 1429 (9th Cir.1994). Here the Court of Appeal noted that reasons grounded in individual bias rather than group bias are permissible, and that the neutral reasons fell within that category: "None of them constitutes a sham excuse or can be construed as an effort to disguise group bias." Ex. E at 19–20.

In sum, petitioner has not rebutted the presumption of correctness afforded the state court findings of fact as to the decisive issue of discriminatory intent, and has not established that the finding is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Torres,* 223 F.3d at 1107.

### iv. *Jurors Lawton and Smithfield*

The court has also considered the peremptory challenges of prospective jurors Smithfield and Lawton, both of whom are also Native American, although as noted in

footnote three, above, it is unclear whether petitioner intended to assert her *Batson* claim as to those challenges. Unlike the situation with Rindels, as to these two prospective jurors the prosecutor presented only race-neutral explanations at the second *Batson* step.

The prosecutor gave prospective juror Lawton a grade of C–based upon her answers to questioning by the court and defense counsel. Ex. H, Vols. 13–14 at 3379. He noted that her husband had been divorced and ordered by the court to pay child support. *Id.* She had indicated that she had followed a high-profile trial in which petitioner's counsel had secured an acquittal and favorable media coverage. *Id.* at 3380. He noted that winter was approaching and that Lawton's commute would involve a road that was sometimes closed. *Id.* He indicated that this might cause an interruption in trial and that he preferred to avoid that. *Id.* He concluded by stating his impression that she was not "overly ·educated" and "weak" and noted that she had announced she would have difficulty speaking out loud if her verdict was read and that the possibility would affect her ability to render a decision. *Id.* at 3381.

The prosecutor gave prospective juror Smithfield a grade of C for her answers. *Id.* at 3382. He noted that she claimed hardship, was the sole support for her family, and was concerned about any absence from her job as a teacher. *Id.* She had an uncle who had been arrested for drunk driving and her husband was a recovering alcoholic. *Id.* at 3383. The prosecutor commented on the fact that the court had been asking questions about alcoholics which, in his mind, left the jury with an impression that recovered alcoholics or addicts (like petitioner and defendant Leahy in this case) were "somehow ... more believable than others." *Id.* He

noted that in addition to claiming hardship like other jurors, Smithfield had taken the additional step of writing the court a letter reemphasizing "how important she thought her position was and how important she thought it was that she be there." *Id.*

The Court of Appeal found the fact that prospective juror Smithfield's husband was a recovering alcoholic was "a powerful reason, and one which alone justifies the exercise of a peremptory challenge against Smithfield." Ex. E at 20. The court found the reasons offered against prospective juror Lawton to be "solid" and relevant to this particular case. *Id.* at 21.

As she did regarding Ms. Rindels, petitioner claims that other jurors had similar characteristics and were not challenged. Traverse at 18–20. However, this showing is not particularly strong. Moreover, in light of the discussion above, it is not enough to rebut the presumption of correctness afforded the state court findings of fact as to the decisive issue of discriminatory intent. Petitioner's *Batson* claim concerning all three jurors fails.

2. *Change of venue*

a. *Standard*

 The Due Process Clause of the Fourteenth Amendment safeguards the Sixth Amendment right of a criminal defendant facing trial by jury to "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Accordingly, a trial judge must grant a motion for a change of venue if prejudicial pretrial publicity makes it impossible to seat an impartial jury. *Gallego v.. McDaniel,* 124 F.3d 1065, 1070 (9th Cir.1997). A defendant must demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual. *Id.* This distinction is clearly established Supreme Court law for purposes of application of the standard of review under the

AEDPA. *Nevers v. Killinger,* 169 F.3d 352, 362 (6th Cir.1999) (citing *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), and *Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)), *overruling on other grounds recognized by Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir.2000).

 Prejudice is presumed when the record demonstrates that the community where the trial was held was "saturated" with prejudicial and inflammatory media publicity about the crime. *Id.* The publicity must be so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial. *United States v. Croft,* 124 F.3d 1109, 1115 (9th Cir.1997). Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situations. *Gallego,* 124 F.3d at 1070; *Croft,* 124 F.3d at 1115; *see, e.g., Fetterly v. Paskett,* 163 F.3d 1144, 1148 (9th Cir.1998) (no presumed prejudice where pretrial publicity was comprehensive, but mostly focused on facts of the case rather than on inflammatory material that could not be admitted in evidence, and there was no evidence in voir dire transcript indicating that jurors recalled the case or its facts, or had inflamed passions or hostility toward it); *Gallego,* 124 F.3d at 1070–71 (finding no presumed prejudice where majority of news stories were well-balanced, factual accounts of pretrial events); *Croft,* 124 F.3d at 1115 (finding no presumed prejudice where most recent news stories were factual and not inflammatory). Among the factors to be considered in determining whether prejudice will be presumed are: (1) whether there was a "barrage of inflammatory publicity immediately prior to trial amounting to a huge [ ] wave of public passion;" (2) whether media accounts were primarily factual; and (3) whether media accounts contained inflammatory, prejudi-

cial information that was not admissible at trial. *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir.1998), *amended*, 152 F.3d 1223 (9th Cir.1998).

■ To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside. *See Gallego*, 124 F.3d at 1070. The focus must be on the jurors who were actually seated on the petit jury and it is not enough that some of them had some prior knowledge of the case. *Id.* at 1071–72 (only publicity that operates to deprive defendant of a fair trial may cause prejudice).

■ A state trial court's finding of juror impartiality is presumed to be correct on federal habeas review. *See Ainsworth*, 138 F.3d at 796. The standard of review for this issue is therefore the same as for the *Batson* issue: The Court must presume correct any factual determinations made by the state courts unless the petitioner rebuts the presumption of correctness by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and may not grant the writ unless it concludes that the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

b. *Discussion*

■ Defendants moved for a change of venue on pretrial publicity grounds before voir dire, and renewed the motion after a jury and alternates had been selected. Ex. A at 1143; Ex. H at 3256. Both motions were denied. Ex. A at 1198–99; Ex. H. at 3417. The Court of Appeal of California rejected this issue on direct appeal. Ex. E at 10–14.

In ruling on this issue, the Court of Appeal stated:

Prior to trial, defendants brought a motion for change of venue on grounds that pretrial publicity and strong community sentiment prejudiced potential jurors against them. In support of the motion defendants presented a pretrial publicity survey which showed that:

- 78 percent of the jury pool had heard about the case.

- 49.1 percent thought defendants were definitely or probably guilty.

- There were 31 newspaper articles on the case from November 1991 to March 1992.

- At least 19 television and many more radio stories aired.

Defendants also presented the expert testimony of Dr. Edward J. Bronson, Professor of Public Law at Chico State University, who stated that there was a reasonable likelihood that defendants could not get a fair trial in Humboldt County. He based his opinion on a number of factors including sympathy for the victim, the extent and nature of the media coverage, the description of Chiara as a "transient," and the high recognition factor the case had among the local population. The court denied the motion, and defendants cite this ruling as error.

Ex. E at 10.

The Court of Appeal applied state law to determine whether venue should have been transferred. *Id.* 10–14. Although the federal basis for the claim that a change of venue should have been granted was raised on appeal by Petitioner, *see e.g.*, Ex. C (appellant Leahy's opening brief) at (i), the opinion contains no discussion of the federal constitutional claim. The state court's affirmance was a denial of all her claims, including the federal change of venue claim. *See Grubb v. Public Utilities Comm'n*, 281 U.S. 470, 477–78, 50 S.Ct. 374, 74 L.Ed. 972 (1930) (questions properly raised in appellant's brief necessarily resolved against him by affirmance); *Lu-*

*rie v. State of California,* 633 F.2d 786, 789 (9th Cir.1980) (citing *Grubb* ). Although when there is no state court rationale the federal court cannot analyze the basis for the decision, it can still apply the "objectively reasonable" standard required by *Williams.* *Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir.2000). When confronted with such a decision, a federal court must conduct "an independent review of the record" to determine whether the state court "clearly erred" under controlling federal law. *Id.*

The Court has reviewed the motion for change of venue, Ex. A at 1143, and the evidence submitted in support of it and in opposition to it, Ex. H at 268–548; Ex. I. Although there was substantial publicity, it did not amount to the saturation with prejudicial and inflammatory publicity which gives rise to presumed prejudice. *See Gallego,* 124 F.3d at 1070 (standard). To establish presumed prejudice the publicity must be so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial. *United States v. Croft,* 124 F.3d 1109, 1115 (9th Cir.1997). Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situations. *Gallego,* 124 F.3d at 1070. The news stories and poll results here did not rise to this level.

To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside. *See Gallego,* 124 F.3d at 1070. The jurors who were chosen either had no exposure to publicity or had little recall of the crime. Ex. E at 14 & n. 10. Petitioner failed to establish actual prejudice.

The state court's rejection of this claim was not clear error. *See Tran v. Lindsey,* 212 F.3d 1143, 1152–54 (9th Cir.2000) ("clear error" standard).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall close the file.

**IT IS SO ORDERED.**